# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 27, 2012 Session

# STATE OF TENNESSEE v. MALCOLM WITHEROW

### Appeal from the Criminal Court for Hamilton County
### No. 270539    Rebecca J. Stern, Judge

_____

### No. E2012-00131-CCA-R3-CD - Filed June 28, 2013

_____

A Hamilton County jury convicted the Defendant-Appellant, Malcolm Witherow, of first degree murder for which he received a sentence of life imprisonment. On appeal, Witherow argues the evidence was insufficient to support his conviction, the trial court erred in not allowing prior inconsistent recorded statements by a witness to be admitted as substantive evidence under Tennessee Rule of Evidence 803(26), and the trial court erred in denying his motion for mistrial based upon statements the prosecutor made in closing argument. Discerning no reversible error, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Justin Woodard, (at trial); David C. Veazey, (on appeal) Chattanooga, Tennessee, for the Defendant-Appellant, Malcolm Witherow.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; William H. Cox, III, District Attorney General; M. Neal Pinkston and Brian S. Finlay, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

This case concerns the shooting death of Melissa Hoover, the former girlfriend of the Defendant-Appellant, at the home of their mutual friend, Connie Harrold, in Hamilton County, Tennessee. At trial, Ms. Harrold testified that she had known Witherow for twenty years. She said the victim and Witherow stayed with her from time to time. On the morning of October 10, 2008, the victim, Witherow, and Tyler Baker, a friend of Harrold's son, were drinking coffee at Harrold's house. The victim went outside to roll up the windows of her

car because it began to rain. Witherow followed her. As Witherow exited the house, he told Harrold, "I'm sorry I've got to break my promise, I love you, I'm sorry, Connie." When asked what promise he was referring to, Harrold said, "[Witherow] promised me he would never hurt [the victim] in my house." She could not recall exactly when he had made that promise.

When Witherow and the victim were outside, Ms. Harrold heard loud noises, looked outside her window, and saw Witherow and the victim arguing. She said they were "slapping at each other but nothing really fist to fist or anything." She sat back down and heard another loud noise "like a gun." She then heard the victim "holler, 'Connie, Connie, help me. Help me, Mamma Connie, help me.'" She observed Witherow chasing the victim down the driveway, which she estimated was two or three hundred feet long. She told Baker, who was in the shower, to come outside because Witherow was shooting the victim. Harrold went outside and observed Witherow "walking on the other side of the road. . . . He was going past me, going back towards my house, and I'm going towards the other way." She said initially she could not see the victim but found her "on the side of the road. And I'm holding her in my arms and [Baker] comes out and I tell him to call 911." Harrold said the victim was "limp" and barely breathing. The victim had been shot several times and could not talk, because there was "a bullet penetrating out of her throat." Although Harrold attempted CPR on the victim, she died in Harrold's arms.

A recording of the 911 call was admitted into evidence and played for the jury. During the call, Harrold said that "Malcolm" shot the victim with a "small pistol" and "took off." When asked why Witherow would be angry with the victim, Harrold said that the victim "wore a wire on him several years back" as an informant for the police in a drug case.

On cross-examination, Harrold explained that Witherow made his promise "over a conversation about [the victim] wearing a wire," and that "he was going to retaliate against [the victim] or something. But he promised he wouldn't do it at my house." On the day of the offense, Witherow had been living at Harrold's house for several months, and the victim had been living there for a couple of weeks. Witherow and the victim slept in different areas of her three bedroom house and "were always friendly with each other for the most part." She had never observed Witherow or the victim with a gun. The night before the offense, the victim spent the night at Harrold's house, and Witherow spent the night elsewhere, which was not unusual.

According to Ms. Harrold, on the morning of the offense, Witherow returned to her house at around 7 a.m. She explained that she could not remember every detail concerning that day because it had occurred over three years ago. Although she did not recall whether Witherow had a forty-ounce can of beer in his hand that morning, she agreed that it was not

uncommon for Witherow to drink alcohol in the morning. She also did not recall smoking marijuana with the victim that morning but agreed that they had done so prior to the offense. She had observed Witherow and the victim argue prior to the offense, but she had never observed Witherow strike the victim. She testified that Witherow told her that he was going to hurt the victim "probably a few months" before the offense, but she never thought Witherow would hurt the victim. Finally, Harrold agreed that she did not see Witherow with a gun on the day of the offense.

Mr. Tyler Baker, a friend of Ms. Harrold's son, testified that he was living with Harrold on the day of the offense, and had known the victim and Witherow for "just a couple of months." On the morning of the offense, Baker said the victim had agreed to drive him to a job interview. He was sleeping on a chair by the front door when he saw Witherow enter Harrold's house. He fell back asleep, and nothing unusual happened until he was in the shower and heard gunshots. He initially thought it was a car, but then he heard screams. He walked outside and saw Witherow walking up the driveway "just real calm" with a small silver gun in his right hand. Baker testified that Witherow "looked at me and I asked him what happened and he just didn't say nothing. He just got in the car and left." Baker called 911, handed Harrold the phone, and ran to help the victim.

Baker testified that Witherow told him several times a week that the victim had "wor[n] a wire on him." Baker said that Witherow told him the investigation "made him lose everything . . . . he wanted revenge." Witherow also told Baker he was going to kill the victim and that he would "get away with it . . . . [and] do a year and a half . . . . at a crazy house."

On cross-examination, defense counsel asked Baker, "isn't it in fact the case you lived at Ms. Harrold's house for about a month and a half prior to October 10th?" He answered "yes" but later clarified that by October 10, 2008, he had been staying at Harrold's house "on and off" for "five to six months." Baker met Witherow and the victim when they came to stay with Harrold about three months before the offense. He agreed that Witherow came to live at Harrold's house before the victim. He thought that the victim lived at Harrold's house for "maybe a month" prior to the offense. He said Witherow did not get drunk every night. Prior to the offense, Baker observed Witherow and the victim argue, but had never observed them in a physical confrontation. He thought their arguments occurred because the victim did not want to have a relationship with Witherow.

When asked whether the victim showed him a gun, Baker said, "I want to say she had one. This was weeks before it happened. But I can't remember." Baker testified that the victim had a gun in a brief case in the trunk of her car and sold it "probably a week" before the offense. He said the gun was "probably a .22" and described it as small and silver. Baker

said Witherow also showed him two guns, a black revolver and a silver gun, a week before the offense. He did not observe Witherow hunt animals or shoot the guns around Harrold's property. Asked whether Witherow threatened the victim in her presence, Baker said "Maybe sometimes. Sometimes she didn't worry about it; sometimes she thought he was just talking."

Sergeant Dean Beverly of the Cleveland Police Department testified that he investigated Witherow in 2005 for drug trafficking in Bradley County. He utilized the victim as a confidential informant in two controlled drug purchases from Witherow. He confirmed that the victim wore a wire during the investigation. Witherow was subsequently arrested and charged with the sale and delivery of Schedule II narcotics. The charges were eventually dismissed because the State was unable to locate the victim to testify at trial. On cross-examination, Sgt. Beverly said he did not know whether Witherow knew the victim had served as a confidential informant in his case. He explained, under normal circumstances, that information was provided to a defendant by the District Attorney General's Office upon request through discovery.

The director of admissions at Moccasin Bend Mental Health Institute testified that on the day of the offense, she was summoned to the admissions area of the hospital to meet Witherow. She asked how she could help him, and Witherow replied, "that he wanted to be evaluated. Said he had shot his girlfriend." Witherow told her he had thrown the gun in the river. The director called an admitting physician, the hospital attorney, and the police department. The director described Witherow as "tearful" and "unkept." She did not detect an odor of alcohol about his person, and he appeared to understand her questions. Witherow was evaluated by a physician, but he was not admitted to the mental hospital.

Detective Mark Miller of the Hamilton County Sheriff's Office identified photographs he took of Witherow's car parked outside of the mental hospital, which were admitted as exhibits. Witherow's car was towed to the Sheriff's Office and preserved in a secure area. On cross-examination, he stated that he followed the car to the Sheriff's Office and was present when it was unloaded, but he did not search it because he did not have a search warrant.

Detective Robin Langford of the Hamilton County Sheriff's Office identified photographs and a diagram of the crime scene which were admitted as exhibits. He described what he believed to be droplets of blood at the scene and the location of the victim's body. He also identified swabs of suspected blood, a set of keys found in the street, and two Winchester .25 caliber spent shell casings retrieved from the scene, which were also admitted into evidence. Photographs of Witherow's car, which was processed for evidence after a search warrant was obtained, were also identified and admitted into evidence.

-4-

Finally, Detective Langford identified a gunshot residue kit and the samples he obtained from Witherow's car. These items were forwarded to the Tennessee Bureau of Investigation for analysis and admitted as exhibits at trial.

Detective Rick Whaley of the Hamilton County Sheriff's Department was the case agent assigned to investigate the victim's death. He said a handgun was never recovered in the case despite the search efforts of a dive team. Detective Whaley identified Witherow's clothing, admitted as an exhibit, that was collected at the police annex. He observed other detective's take a buccal swab of Witherow's mouth pursuant to a search warrant. Detective Whaley identified these swabs, which were entered into evidence. He also observed Dr. Frank King's autopsy of the victim. He identified fingernail clippings, a blood sample, and a bullet he obtained from the victim's autopsy, all of which was sent to the Tennessee Bureau of Investigations for analysis. Detective Whaley said the victim's body was found "a little over a hundred yards" from the bottom of the driveway.

On cross-examination, Det. Whaley said Witherow's hands were tested for gun shot residue at the police annex on the day of the offense. He was unable to determine the position of the shooter or the victim at the time she was shot.

Dr. Frank King, the Hamilton County medical examiner, performed the autopsy of the victim and testified as an expert in forensic pathology. He identified the autopsy report and his report of investigation, which were admitted as exhibits. He said the victim's cause of death was multiple gunshot wounds, and the manner of death was homicide. He said the "gunshot wounds passed through the chest, abdomen, and right arm, . . . causing damage to internal organs, bleeding, and subsequent death." He found fresh and old bruises on the victim's legs. Dr. King explained that a bullet wound consists of "entrances, exits, and graze wounds." He determined that six or seven bullets struck the victim, creating fourteen different gunshot wounds. He said the victim was alive when each bullet entered her, and "[a]ll of these gunshot wounds occurred close together in time." He opined that the victim was "going through different positions . . . [and] could be partly on the ground or all the way on the ground when some of these shots occurred."

Based on the similar appearance of the gunshot wounds, Dr. King opined that "the same gun or type of gun, same ammo[,] could cause all these similar looking wounds." He testified that the victim's wounds "all looked very similar, all caused by low velocity gunshot wounds." Finally, he stated that one bullet remained in the victim's body.

Special Agent Shelley Betts, a forensic scientist and firearms examiner with the Tennessee Bureau of Investigation, testified as an expert in the field of firearms identification. She found no gunshot residue on the victim's clothes and was unable to

determine a muzzle-to-garment distance. She testified that the two fired cartridge cases she examined "had the same unique identifying marks[,] . . . so [she] was able to conclude that they had both been fired in the same .25 auto caliber pistol." Based on her testing, she further concluded that the bullet which came from the victim's body was a .25 caliber bullet.

On cross-examination, Agent Betts testified "there could have been any number of factors that would preclude [her] from determining a muzzle to garment distance." She said the gun could have been fired beyond "the maximum distance at which that gun and that type of ammunition would deposit gunshot residues on an item of clothing." Or, she said, the residue could have been lost and "environmental factors like a lot of mud or rain or a lot of blood could have destroyed [gunshot residue] evidence." She was unable to determine whether the bullet and shell cases were fired from the same gun because a gun was not recovered. She said "[t]here could have been one or two guns used in this case."

Special Agent James Russell Davis, III, of the Tennessee Bureau of Investigations testified as an expert in the field of microanalysis in trace evidence. He identified his report on the gunshot residue kit performed on Witherow's hands. Although the test was inconclusive for gunshot residue, it did not eliminate the possibility that Witherow could have fired, handled, or was near a gun when it fired. Agent Davis also identified his report analyzing the evidence retrieved from Witherow's car. His test revealed the presence of particles unique to gunshot primer residue on a sample from Witherow's driver's seat belt or pull strap. Agent Davis said this indicated that a weapon was fired in close proximity of that particular item or that it was transferred from someone's hands. Both of Agent Davis's reports were admitted as exhibits at trial.

On cross-examination, Agent Davis agreed that the elements lead, barium, and antimony can be naturally occurring. He reiterated, however, that the gunshot residue found on Witherow's driver's seat belt came from a weapon that was fired. He also agreed that this residue could have come from Witherow being near a gun when it was fired or handling a gun after it was fired.

Detective Brian Ashburn, called as a witness by Witherow, testified that he conducted an interview with Baker which was recorded. Detective Ashburn testified that during the course of the interview Baker said that he had lived at Harrold's house "for about one to one and a half months" prior to the offense. The corresponding portion of the recording was played for the jury and largely inaudible. Baker was heard to say "about a month and a half." Detective Ashburn also testified that during the same interview Baker told him that Witherow had been living with Harrold for "a few weeks" prior to the offense. The corresponding portion of the recording was played for the jury and, again, was largely inaudible. Baker was

heard to say "could be . . . about a month. Because I know it was about a week or two weeks before that I moved in there. Because I'd just met him. I'd never met him before."

Detective Ashburn agreed that Baker told him during the course of the interview that Witherow would get drunk and talk about killing the victim. The corresponding portion of the recording was largely inaudible; however, Baker is heard to say "I mean, [Witherow is] always like saying I'm going to kill that b----, . . . . But I mean you know (inaudible) . . . . almost a week and a half but I won't go to jail because I (inaudible) about it." Another portion of the recording was played for the jury in which Baker said that Witherow and O'Donald left Harrold's house the night before the offense, and went to Meigs. Baker said Witherow and O'Donald arrived at Harrold's around 7 a.m. on the day of the offense and Harrold's son left around 8 a.m. Detective Ashburn agreed that Baker said Witherow had been out that night with O'Donald, rode in O'Donald's new car, and that Baker told him Witherow had been in Georgia with a girl two nights before the offense. The corresponding portion of the recording was played for the jury in which Baker said "Like two nights before . . . [Witherow] went down to Georgia and had sex with some girl, and that's what was killing him in his mind. . . . I don't know what girl, I don't know anything. He was just using his cell phone so." Detective Ashburn agreed that Baker said Witherow threatened to kill the victim only when he was drinking or intoxicated but not when Witherow was sober. The corresponding portion of the recording was played for the jury in which Baker said "[Witherow] was never mad at [the victim] when he was sober. He just really didn't talk to nobody that much."

Detective Ashburn agreed that Baker did not say that he lived with Harrold longer than one and a half months during the course of the interview. Detective Ashburn testified that Harrold told him that when Witherow arrived at her home on the day of the offense he was intoxicated and had a forty-ounce can of beer in his hand.

Dr. Laura Boos of the Tennessee Bureau of Investigations testified as an expert in serology and DNA. She analyzed various items of evidence in this case and said that blood was found on Witherow's jeans and shoes but not on a belt, shirt, cell phone case, watch, rings, swabs from the roadway, or the two cartridge cases. Upon further testing, she found blood and DNA on three swabs from the roadway, and two of these matched the victim's DNA while the third had insufficient or degraded DNA and could not be matched. Dr. Boos tests also showed that the DNA on Witherow's shoes matched the victim's DNA. She explained that it is not uncommon for DNA to be undetected on shell casings, because the heat produced by the firearm degrades DNA. On cross-examination, she said that the blood on Witherow's jeans was his blood.

Witherow testified that he had known the victim for seven or eight years and Harrold for fifteen or twenty years. He said he had a romantic relationship with the victim, during which she lived with him. Their relationship ended two years before the victim's death. Witherow said the victim invited him to visit with her, but he declined. He said he allowed the victim to stay with him when she had nowhere else to stay. He said he brought the victim to Harrold's house to live, because he "didn't want to see her with nowhere to stay." He could not recall how long the victim lived with Harrold, but he knew it was more than a week.

Witherow said he stayed with Harrold only a few days in October 2008. At that time, Witherow lived with his new girlfriend in Bradley County. He spent the night away from her only when they argued. When Witherow and the victim were together at Harrold's house, they would sometimes argue. Witherow said it was because the victim was jealous of his attention to other women. He said he argued with the victim a couple of days before her death because she did not go to the liquor store for him.

While living with Harrold, Witherow was employed as a cement worker and had periods without work. The morning before the offense, he and a friend hunted squirrels with a .22 rifle in the Ooltewah area and shared a pint of vodka that afternoon. James O'Donald, whose nickname was "Possum", drove to Harrold's house, and Witherow left with O'Donald to go to a house in Birchwood. Upon their arrival, O'Donald and Witherow drank a case of beer. Witherow slept a couple of hours that night, and the next morning, he drove O'Donald's car back to Harrold's house. Witherow could not remember exactly when they arrived at Harrold's house but thought it was around 8:00 a.m. When asked if he was "doing any drinking when [he] came back," Witherow replied, "I had a quart of beer." He also had consumed a cup of coffee at Harrold's that morning.

Later that morning, Witherow went outside of Harrold's house to receive better cell phone reception and to determine if he had received a telephone call concerning a job. The victim was getting something out of the trunk of her car when Witherow exited the house, and they spoke. Witherow said the victim told him earlier in the week that she would take him to meet someone about a job. However, the victim told him she was taking Baker to a job interview at that time and that Witherow would have to wait until they returned.

Witherow could only remember driving in his car after his conversation with the victim. He explained that his "memory ain't too good." Witherow said he drove to the mental hospital "because everything seemed like it was a dream . . . . I tried to run in and talk to them and see about getting some medicine or something because I was feeling like I was in a dream that whole morning." He did not remember having a gun or shooting anyone on the day of the offense. When asked, "Did you shoot anybody that morning?" Witherow

responded, "I don't know." He said the previous evening he took a hydrocodone pill because he had a headache. He said he did not know why he drank a lot and said "I guess to calm me down sometime." Witherow agreed that he had a .22 caliber rifle for squirrel hunting and a .410 caliber shotgun for rabbit hunting on the day of the offense, both of which were borrowed. While he had owned a handgun in the past, he said he did not own a handgun on the day of the offense.

On cross-examination, Witherow said he and O'Donald drank Budweiser the night before the offense. He recalled only the nickname of the friend, "Rook", who drank one or two beers with them. He said he hunted squirrels with a .22 rifle alone the night before the offense. He admitted that he was angry with the victim because she wore a wire and acted as an informant for the police, but said he "got over it." He remembered apologizing to Harrold and explained the following:

> [I]t wasn't about - - what I was apologizing to her for, she told me . . . . don't hit no woman up there on the hill at her house. And you know I said . . . . I wouldn't hit nobody. Just said don't hit . . . . because I have a few girlfriends that we just friends, but other people might think something else but. . . . I wasn't going to hit [the victim]. I was just jiving her.

Witherow denied telling others that he was going to retaliate against the victim for snitching on him. Witherow also said "even if . . . I . . . was going to do something like that, I wouldn't [do] it around people no way." He said he "vaguely" remembered the victim's bleeding body lying in the road. He said on his way to the mental hospital, he stopped to get a sandwich and gas. He said he told the director at the mental hospital that he only "thought" he shot his girlfriend. He said he could remember drinking Budweiser the night before the offense because it was his usual type of beer.

Based on the above proof, the jury convicted Witherow as charged, and he was sentenced to life imprisonment. The trial court denied Witherow's motion for new trial and a timely notice of appeal was filed.

## ANALYSIS

**I. Sufficiency of the Evidence.** Witherow contends that the element of premeditation "hinge[d] almost solely on the testimony of Tyler Baker." As such, Witherow argues that the State would have been unable to prove premeditation if the jury had been permitted to consider Baker's audio or video recorded statements as substantive evidence. The State argues, and we agree, that the evidence was sufficient to support his conviction of first degree murder.

First degree murder is defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202 (2006). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

"Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551

S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

In regard to the sufficiency of the evidence, Witherow generally argues that if the jury was permitted to consider Baker's statements to the police as substantive evidence, "it would have been difficult for the jury to infer premeditation."[1] We conclude that there was overwhelming proof in this case upon which a rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt. A few months before the victim's death, Witherow promised Harrold, a long time friend, that he would not hurt the victim. When asked to explain the promise, Harrold said Witherow was angry because the victim had "worn a wire on him" which resulted in Witherow's arrest and subsequent indictment. Immediately before Witherow walked out of Harrold's home on the day of the offense, Witherow apologized to Harrold for breaking his promise. Minutes later, Harrold heard gunshots and saw Witherow chasing the victim down her driveway. Harrold heard the victim scream for help. She then observed Witherow standing over the victim's lifeless body. As Baker was going to assist the victim, he observed Witherow walk by him with a gun in his right hand. The victim was shot once in the chest, once in the throat, and four times in the back. Her body was riddled with a total of fourteen bullet wounds.

A shell casing and a trail of the victim's blood was found in the driveway of Harrold's home. The trail of blood led to the main road, approximately 100 feet away, where the victim's body was found. Gunshot residue was found on Witherow's seat belt and the

_____

[1] The extent of Witherow's argument on this issue is six sentences. Although he argues, "If only [Baker's] statements to police were taken into account it would be difficult for any trier of fact to infer premeditation," he fails to identify with specificity which statement from Baker should have been considered. In fact, Witherow fails to support this portion of his brief with any citation to the record at all. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. Id.; State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000).

victim's blood was found on his shoe. After fatally shooting the victim, Witherow drove to a mental hospital and told personnel that he had shot his girlfriend and had thrown the gun in the river. This is more than sufficient proof for a reasonable juror to conclude that Witherow committed the offense of first degree murder. Witherow has failed to satisfy his burden of illustrating why the evidence is insufficient to support the jury's verdict. Bland, 958 S.W.2d at 659. He is not entitled to relief.

**II. Admission of Statements under Rule 803 (26) of the Tennessee Rules of Evidence.** Witherow argues that the trial court "erred in not allowing prior inconsistent audio/video statements by Tyler Baker to be admitted as substantive evidence" pursuant to Rule 803(26) of the Tennessee Rules of Evidence. In response, the State contends that these prior statements of Baker were not admissible because they either were not relevant, were not inconsistent, or were not subject to Baker's explanation or denial. The State further contends the trial court did not abuse its discretion in denying Witherow's request for a hearing outside the presence of the jury to determine whether the prior statements were made under circumstances indicating trustworthiness.

Under Rule 803 (26) of the Tennessee Rules of Evidence certain prior inconsistent statements of a witness are admissible if all of the following conditions are met:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26) (2009). To be admissible as substantive evidence under Rule 803(26), the statement must comply with Rule 613(b). Rule 613(b) permits extrinsic evidence of a prior inconsistent statement to be admissible only if "the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b).

The events which led to defense counsel's request to allow Baker's recorded statements to the police to be admitted as prior inconsistent statements pursuant to Rule 803(26) unfolded in a somewhat convoluted manner and deserve attention. The record

reflects that during cross-examination of Baker, defense counsel approached the bench and requested permission to introduce the portion of Baker's interview with the police in which Baker apparently said Witherow had a girlfriend in Georgia and was "in a good mood" two days before the offense.[2] Without stating a specific basis for its admissibility, defense counsel said he was seeking to impeach Baker's testimony regarding whether he recalled Witherow visiting a woman in Georgia. After a lengthy discussion, the trial court allowed defense counsel to question Baker, outside the presence of the jury, for the purpose of clarifying Baker's previous answers on cross-examination. At this point, the following exchange occurred between Baker and defense counsel:

> Q: Mr. Baker, do you recall that in the days prior to October 10th that Malcolm Witherow stayed with a girlfriend down in Georgia?
> A: No, I don't recall.
> Q: You don't recall or did that never happpen?
> A: He may have, but I don't remember.
> Q: Do you ever recall telling the detective anything like that?
> A: No. I may have, but I don't - - it's not a distinctive image.

Defense counsel indicated that he wanted to refresh Baker's recollection with a recording of his interview. After another lengthy discussion concerning whether a written statement as opposed to a recording could be used to refresh recollection, the trial court denied Witherow's request to use the recording. Defense counsel then requested permission to refresh Baker's recollection with Detective Ashburn's written synopsis of the interview, which the trial court allowed. Cross-examination of Baker resumed and defense counsel attempted to refresh Baker's recollection. Initially, without showing Baker the synopsis, defense counsel asked Baker if he remembered Witherow "being calmer" before the offense. Baker replied, "Some days." Defense counsel asked if Baker "recalled Witherow being essentially over it?" Baker replied, "I don't think he ever got over it."

After showing Baker the synopsis, defense counsel asked, "Does that refresh your recollection at all what occurred?" Baker replied, "Yeah. I believe that's what happened." Counsel then repeated the same questions concerning whether Baker thought Witherow was "over it." He also asked Baker whether Witherow was intoxicated when he made threats to kill the victim and whether Baker lived at Harrold's house one to two weeks before the

---

[2] Throughout the transcript defense counsel refers to an "audio interview" and a "video" interchangeably. Neither an audio or a video was included in the record on appeal as an offer of proof. Accordingly, it is unclear to this court whether counsel is referring to a video or audio recording of Baker's statement to the police in this case.

offense. Baker responded "Sometimes [Witherow] was, sometimes he wasn't. He never did get too drunk." Baker also said he lived at Harrolds "on and off" for the last three years.

The next day at yet another bench conference and after reviewing memorandum and authority submitted by defense counsel, the trial court informed the parties that it had erred in not allowing defense counsel to impeach Baker with the recording of Baker's statement to the police. The trial court was prepared to allow defense counsel to play the recording; however, at this point, Baker had been excused and outside the court's jurisdiction. The State objected to Witherow playing the entire recording for the jury because some of the statements on the recording were consistent with Baker's testimony. The trial court then allowed defense counsel to play portions of the recording with the aid of Detective Ashburn's testimony concerning the interview.

The trial court told the jury that the previous day defense counsel asked to play part of a recording during Baker's testimony and that the court had incorrectly not allowed it. The court explained that Baker was no longer available as a witness and that "the next best thing" would be to admit the recording through the detective who interviewed Baker. The trial court said, "It's my mistake, don't hold it against anybody else." The trial court explained that the parts of the recording which would be played would not be evidence but rather would be used only to assess the credibility of Baker. Defense counsel objected to the use of the recording for impeachment purposes only and argued that Rule 803(26) allowed it to be considered as substantive evidence. Defense counsel then requested a hearing outside of the jury to prove by a preponderance of the evidence, pursuant to Rule 803(26)(C), that the video was made under circumstances indicating trustworthiness. The court overruled his objection, did not hold such a hearing, and admitted parts of the recorded statement for impeachment purposes only.

The following day, in a motion to reconsider, defense counsel argued that the recorded statements should be admitted as substantive evidence because they were necessary to his defense of intoxication. The trial court denied his request and stated that the "video taped interview would have to be under oath in order for it to be substantive evidence."

In his brief to this court, Witherow claims that three of Baker's responses at trial complied with Rule 613(b). Although not specifically identified in his brief, we presume, based on his citation to the record, that the three responses are as follows:

(1)    Q:    A couple of days prior to the incident do you recall whether or
              not Malcolm was less angry about things?
       A:    I couldn't tell a difference. Some days he was, some
              days he wasn't.

-14-

(2)  Q:  Do you recall telling the officers that [the gun] had a wooden handle?
     A:  I don't remember telling them that.

(3)  Q:  [D]o you recall that in the days prior to October 10th that Malcolm Witherow stayed with a girlfriend down in Georgia?
     A:  No, I don't recall.
     Q:  You don't recall or did that ever happen?
     A:  He may have, but I don't remember.

Given the above exchanges and as later noted by the trial court, defense counsel should have been permitted to use the inconsistent portions of Baker's recorded statement to impeach Baker pursuant to Rule 613.[3] We also agree with Baker and conclude that the trial court failed to hold a hearing outside the presence of the jury to determine the trustworthiness of the recorded statement in order to comply with Rule 803(26)(c). We have thoroughly reviewed the record in this case and conclude that any error in not admitting Baker's recorded statements as substantive evidence was harmless. State v. Cannon, 254 S.W.3d 287, 298-99 (Tenn. 2008) (quoting State v. James, 81 S.W.3d 751, 763 (Tenn.2002) and citing Tenn. R. Crim. P. 52(a) and Tenn. R. App. P. 36(b)). The burden rests on the defendant "to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). "The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." Id.

Here, similar to his first issue, Witherow demands a new trial due to the trial court's error claiming that "[t]he jury could have reasonably inferred from Mr. Baker's statements to police that there was reasonable doubt as to the element of premeditation." For the reasons articulated in issue one, we disagree. The evidence of guilt in this case was overwhelming. Any error by the trial court in failing to admit Baker's video statements as substantive evidence had no bearing on the aforementioned proof. Accordingly, Witherow has failed to prove that the trial court's error "more probably than not had a substantial and injurious

---

[3] We are compelled to note that the trial court's erroneous ruling on this issue was compounded by the evolving grounds upon which defense counsel sought to admit Baker's recorded statements. In addition, defense counsel as well as the trial court believed that Baker genuinely did not remember his previous statements to the police and initially sought to admit them pursuant to Rule 612 of the Tennessee Rules of Evidence.

impact on the jury's decision-making." Rodriguez, 254 S.W.3d at 372. Witherow is not entitled to relief on this issue.

**III.  Denial of Motion for Mistrial Based on Prosecutorial Misconduct.**  In his final issue, Witherow contends that the "prosecutor 'inflamed the passions' of the jury" by making reference to a recent shooting death of a local police officer.  In response, the State contends that the prosecutor's statement did not inflame the jury, and the trial court correctly denied Witherow's motion for mistrial.  We agree with the State.

The Tennessee Supreme Court has noted that "[c]losing argument is a valuable privilege that should not be unduly restricted." State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion.  Id. In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant.  Id. (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996).

This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

-16-

The relevant portion of the prosecutors closing argument in this case is outlined below:

> But this case, it's not only about the death of Melissa Hoover. But it's also about how we combat violence when violence occurs. You hear all kinds of stuff in our society today about people getting killed. Youth, adults, sergeants falling. All that. . . . So how do we combat violence? This is how we combat violence. Is when officers of the sheriff's office go out and begin investigating a case, and they collect blood evidence, they collect shell casings, they take witness statements, they take gunshot residue from a vehicle. And they send items to the TBI. There is an autopsy that occurs. And then after an investigation is completed we come into a court of law and we have a trial. But how we combat violent acts such as this is that we have the law and we have evidence. And when the State of Tennessee submits to you evidence beyond a reasonable doubt that a violent action occurred, that a young lady was killed intentionally and premeditatedly, then the law requires you as jurors to make a decision.
>
> . . . .
>
> So in order to combat acts like this, let's not turn our back or run away. But when you bring forth the evidence and you bring forth the law, that's what guides us, that's what dictates us. . . .

Based on the above argument, Witherow claims the prosecution inflamed the passions of the jury and diverted their attention from deciding the case based on the evidence by "inject[ing] the irrelevant issue of fallen officers and ask[ing] the jury to 'combat violence.'" Upon our review, we conclude that the prosecutor's comments did not constitute prosecutorial misconduct. The prosecutor asked a rhetorical question, "So, how do we respond to violence?" He then outlined the collective action law enforcement took in order to bring the instant case to trial. We acknowledge that the prosecutor made an isolated reference to "sergeants falling" in the preceding sentence. In light of the <u>Judge</u> factors, however, this comment did not affect the verdict to Witherow's detriment. He is not entitled to relief.

## CONCLUSION

Finding no reversible error, we affirm the judgment of the Hamilton County Criminal Court.

_____
CAMILLE R. McMULLEN, JUDGE